IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | |
|---|---|
| In re: ) | |
| GREGORY B. MYERS ) | Case No. 15-26033-WIL |
| ) | |
| Debtor. ) | (Chapter 7) |
| ) | |
| ) | |
| GREGORY B. MYERS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Adv. No.: 16-00474 |
| ) | |
| OFFIT KURMAN, P.A., ) | |
| ) | |
| Defendant. ) | |
| ) | |

**NOTICE OF PROPOSED COMPROMISE AND SETTLEMENT**

TO ALL PARTIES-IN-INTEREST:

PLEASE TAKE NOTE that Roger Schlossberg, Chapter 7 Trustee of the Bankruptcy Estate of Gregory B. Myers ("Trustee"), the Plaintiff herein, contemporaneously has filed his *Motion for Approval of Proposed Compromise and Settlement* (the "*Settlement Motion*") seeking authority to compromise and settle the following described causes of action upon those terms and conditions hereinafter noted.

**Background of Dispute and Litigation**

Gregory B. Myers ("the Debtor") filed a voluntary Chapter 11 bankruptcy petition on November 18, 2015. The Debtor remained in possession of the estate's assets and managed its financial affairs until February 22, 2017, when the case was converted to a proceeding under Chapter 7 of the Bankruptcy Code and the Trustee thereafter was duly appointed as the Chapter 7 Trustee herein.

On March 18, 2016, Offit Kurman, P.A. filed Proof of Claim ("POC") No. 14 which asserted secured and unsecured claims against the Debtor in connection with its provision of legal services to the Debtor and his non-debtor spouse, Barbara Ann Kelly. In its POC, Offit Kurman claimed that $215,000.00 was secured by a mortgage on Lot 6, Seaside 14, Santa Rosa Beach, FL 32459 (hereafter "Lot 6"), a parcel jointly titled in the name of the Debtor and Kelly. Offit Kurman also claimed a general unsecured claim in the amount of $24,094.36.

On October 18, 2016, Offit Kurman filed an Amended POC (No. 14-1) in which it asserted a total claim of $758,722.23, which included a $550,000.00 secured claim against Lot 6, a $23,605.96 unsecured claim against the Debtor, and a joint unsecured claim of $185,116.27 against the Debtor and Kelly. Offit Kurman's Amended POC is summarized in the chart below:

| Description | Amount |
|---|---|
| **Litigation Group #1  (owed by Barbara Kelly per Credit Agreement)** | |
| 1. Seaside HOA case | $131,074.50 |
| 2. Regions Bank case | $122,323,95 |
| 3. Lot 6 foreclosure case | $ 84,259.84 |
| 4. Naples foreclosure case | $358,190.72 |
| TOTAL | $695,849.01 |
| **Portion secured by Lot 6 Mortgage** | **$550,000.00** |
| Unsecured Balance Owed by Barbara Kelly | $145,849.01 |
| **Litigation Group #2  (owed by Greg Myers)** | |
| 1.  Naples contract claim | $   1,167.06 |
| 2.  Disability claim | $ 22,438.90 |
| TOTAL | **$23,605.96** |
| **Litigation Group #3  (owed by Greg Myers and Barbara Kelly)** | |
| 1.  Silver Laurel Way foreclosure case | $123,035.03 |
| 2.  Wetherill Road foreclosure case | $ 62,081.24 |
| TOTAL | **$185,116.27** |
| **TOTAL CLAIM** | **$758,722.23** |

On October 18, 2016, the Debtor commenced the instant adversary proceeding against Offit Kurman. In his Complaint, the Debtor requested a judicial determination of the validity and extent of Offit Kurman's secured claim as well as the disallowance of Offit Kurman's proof of claim in its entirety.

In the Complaint, the Debtor alleged that Offit Kurman breached its Credit Agreement with Barbara Kelly by failing to prosecute the four legal actions described therein to their ultimate conclusions.[1] Therefore, according to the Debtor, the underlying security given by Kelly and the Debtor to secure the payment of Offit Kurman's legal fees – the mortgage to Lot 6 – was rendered voidable.

The Debtor further alleged that, notwithstanding the alleged breach of the Credit Agreement, the maximum security Offit Kurman could claim was $215,000.00 because another parcel also pledged as security under the agreement (Lot 3 of Town Center 30-A East, Santa Rosa Beach, FL) previously was sold for $335,000.00 to satisfy other outstanding legal bills.

The Debtor further alleged that he and Kelly incurred unspecified damages which were caused by Offit Kurman. The Debtor claims that he is entitled to offset these damages against the amounts claimed by Offit Kurman.

The Debtor further alleged that Offit Kurman's unsecured claim against him, individually, was overstated and failed to reflect all payments made by him. The Debtor alleged that Offit Kurman's individual unsecured claim is no greater than $20,482.00.

---

[1] Although three of the four actions listed in the Credit Agreement involved the joint representation of Myers and Kelly (the Regions Bank case, the Lot 6 foreclosure and the Naples foreclosure), Offit Kurman agreed that Barbara Kelly would be solely responsible for all legal fees incurred in the four actions in exchange for the grant of a mortgage by Myers and Kelly on Lot 6, which they jointly owned, and Lot 3, which was owned solely by Kelly.

Finally, the Debtor alleged that there is no agreement between him and Offit Kurman regarding payment of the unsecured joint claim asserted by Offit Kurman.

Separate and apart from the instant adversary proceeding, the Debtor has scheduled a legal malpractice claim against Offit Kurman arising out of its representation of him in the Naples foreclosure case. The Debtor has valued the malpractice claim at $5 million.

Late last year, this Court approved the sale of Lot 6 for the sum of $1,722,500.00. Following the satisfaction of a lien held by Regions Bank, and the payment of real estate taxes, a broker's commission, and other expenses, a total of $1,110,247.01 has been placed in escrow (hereafter "the Escrow") pending the resolution of certain disputed claims, including the instant claims by Offit Kurman.[2]

The Trustee succeeded Myers as the plaintiff in the instant adversary proceeding upon conversion of the case to Chapter 7. The Trustee and Offit Kurman now have agreed to compromise and settle the above-described claims, subject to notice to creditors and approval by the Court, on the terms and conditions described below.

## **Proposed Compromise and Settlement**

The Trustee and Offit Kurman have agreed as follows:[3]

(1)  Offit Kurman will have an allowed secured joint claim for $550,000.00 and an allowed unsecured joint claim for $185,116.27.

---

[2] In addition to Offit Kurman's aggregate claim of $758,722.23, the McNamee Hosea law firm has asserted a joint claim against Myers and Kelly in the amount of $203,460.90, which claim is disputed by Myers and Kelly. Seaside III HOA, meanwhile, is entitled to $22,391.66 pursuant to a consent order entered in the Debtor's case.

[3] A true and accurate copy of the Term Sheet agreed to by the Trustee and Offit Kurman is attached hereto and is incorporated herein by reference. The pertinent terms of the settlement between the parties are set forth above.

4

(2) Offit Kurman will waive and forever release its unsecured individual claim against the Debtor in the amount of $23,605.96.

(3) Offit Kurman consents to having $25,000.00 of its allowed secured joint claim and its entire allowed unsecured joint claim of $185,116.27 surcharged by the Trustee (the "Surcharge") to pay for any allowed fees and expenses approved by the Court for the administration of the estate and, if there are sufficient amounts available in the Surcharge, then for a distribution to allowed general unsecured creditors of the estate. The Surcharge will be paid to the Trustee upon Bankruptcy Court approval.

(4) Offit Kurman will receive a distribution of the remaining $525,000.00 of its joint secured claim in immediately available cash from the Escrow upon Bankruptcy Court approval.

(5) Offit Kurman will retain its right to pursue its $145,849.01 unsecured claim against Barbara Ann Kelly and does not release any claims against Barbara Ann Kelly arising out of the Credit Agreement.

(6) Upon Bankruptcy Court approval and the payment of $210,116.27 to the Trustee and $525,000.00 to Offit Kurman, the Trustee shall dismiss the instant adversary proceeding with prejudice.

(7) Offit Kurman shall release and discharge the Trustee and the bankruptcy estate from any and all claims, known or unknown. Offit Kurman also shall release and discharge the Debtor from the unsecured individual claim against the Debtor and from any and all claims, known or unknown, arising out of the Credit Agreement.

(8) The Trustee shall release Offit Kurman from any and all claims, known or unknown, which have been or could have been asserted by the Debtor including, but not limited to, any and all claims sounding in contract and negligence.

(9) The foregoing releases shall be effective upon the dismissal of the instant adversary proceeding; and

(10) Other than the credit to be given against the joint debts described herein, nothing established herein shall release any claims Offit Kurman may have against Barbara Ann Kelly. Any and all such claims are expressly retained by Offit Kurman. (Likewise, Kelly's rights against Offit Kurman are not affected by the proposed settlement and will remain intact).

### Trustee's Analysis and Recommendation

The Court need not conduct a "mini trial" to determine the merits of the litigation. *See In re Ashford Hotels, Ltd.*, 226 B.R. 797, 802 (S.D.N.Y. 1998). "Rather, the court's responsibilities are to familiarize itself with all facts necessary for an intelligent and objective opinion, canvass the issues, and see whether the settlement falls below the lowest point in the range of reasonableness." *Id*. "The court does not substitute its own judgment as to what would be best for the estate but rather determines if the trustee's proposed settlement falls within reasonable judgment under the circumstances of the case." *In re D&R Distributors*, 2016 WL 4821257 (N.D. W. Va. Sept. 12, 2016). The Trustee, after diligent inquiry and in the sound exercise of his judgment as demonstrated below, believes the proposed settlement is in the best interest of the estate and all interested parties herein.

**1.      The Trustee's Investigation**

Prior to reaching an agreement with Offit Kurman, the Trustee conducted a thorough review of all available evidence related to the Debtor's allegations against Offit Kurman and engaged in an extensive analysis of the legal theories upon which the Debtor based his claims against Offit Kurman.

The Trustee reviewed all of Offit Kurman's non-privileged billing records for the various representations that it undertook on behalf of the Debtor and Kelly for which Offit Kurman claims it is entitled to be compensated. The Trustee also reviewed the dockets, court rulings, and the voluminous pleadings in each of the actions in which Offit Kurman advocated on behalf of the Debtor and Kelly for which compensation is sought. Additionally, the Trustee deposed Aaron Bukowitz, the Executive Vice-President and Chief Operating Officer of Offit Kurman.

The Trustee also deposed the Debtor regarding the facts and circumstances attendant to the issues in this adversary proceeding. The Trustee also reviewed the transcript of a prior Rule 2004 examination of the Debtor in which he questioned the Debtor about the complaint he filed against Offit Kurman as well as the scheduled malpractice claim against Offit Kurman. The Trustee also attempted to depose Kelly, but Kelly refused to cooperate in a meaningful examination and, in fact, abruptly walked out of her deposition before it began.[4]

Based on the Trustee's review of the evidence, it appears clear to the Trustee that Offit Kurman performed all of the work that it billed to the Debtor and Kelly in connection with the matters enumerated in its Amended POC. Indeed, there is no allegation in the complaint, nor has any testimony been adduced, from which it could be concluded that Offit Kurman did not perform the work for which it seeks compensation (over 2,000 hours of attorney time spread over five years

---

[4] The Trustee filed a *Motion for Protective Order and to Seal Transcript and Bar Access* following Kelly's contumacious failure to submit to deposition pursuant to the subpoena served on her. The Trustee then made good-faith efforts to reschedule Kelly's deposition but her counsel refused to reciprocate. Ultimately, the Trustee was able to obtain information from other sources and has determined that a deposition of Ms. Kelly is no longer necessary. The Trustee also notes that Kelly's lack of cooperation with the Trustee is not limited to this adversary proceeding as the Trustee has filed two separate motions to compel against Kelly in the administrative case. Both motions were granted by the Court.

7

and more than a dozen proceedings in multiple jurisdictions).[5] Rather, the principal issue in this litigation concerns whether, and to what extent, Offit Kurman's claim is secured by the mortgage on Lot 6.

**2.     Offit Kurman's alleged breach of the Credit Agreement**

After diligent inquiry, the Trustee believes that there is questionable merit to the Debtor's assertion that the mortgage to Lot 6 was rendered voidable because Offit Kurman allegedly failed to prosecute the four legal actions described in the Credit Agreement to their ultimate conclusions.

An examination of the Seaside HOA case is instructive. According to the trial judge in that case, "[t]his lawsuit was – or at least should have been – a relatively simple real estate action involving a possible title defect with respect to a vacant lot in Seaside, Florida. However, it was assigned to three different district court judges; lasted over five years; and generated a huge file incorporating several hundreds of documents and addressing numerous issues." *See* Order entered in *Kelly v. Davis*, Case No. 10-CV-392 (N.D. Fla.), at Dkt. #368. Ultimately, the case turned out to be "much ado about (nearly) nothing" and the trial court entered summary judgment against Barbara Ann Kelly on all counts.[6] *Id*.

Offit Kurman filed the original complaint on behalf of Kelly and remained in the Seaside HOA case until withdrawing on July 23, 2012 pursuant to court order. Offit Kurman later re-entered the case pursuant to the Credit Agreement and remained counsel of record until November 10, 2015, when it again withdrew pursuant to court order. The court entered summary judgment

---

[5] The attorney-client relationship between Offit Kurman and the Debtor and Kelly goes back to 2010. Kelly is a family friend of Offit Kurman attorney Timothy Lynch, Esq., and has known Lynch since childhood.

[6] The Debtor was not a named party in the Seaside HOA case. However, if the Debtor's conduct in his bankruptcy case is any indication, the Debtor most likely was intimately involved with every aspect of the Seaside HOA case notwithstanding his absence as a named party.

nine days after Offit Kurman's second withdrawal, terminating the case in the district court. Kelly subsequently noticed an appeal to the Eleventh Circuit through other counsel. The Eleventh Circuit disposed of the appeal on April 27, 2017, just three days after holding oral argument, stating:

> The lawsuit in this case borders on the frivolous, if it does not cross that border. For the reasons set out in the district court's orders granting summary judgment and the reasons emphasized by this Court during oral argument, we affirm the judgment of the district court in all respects.

*Id*. Following the Eleventh Circuit's disposition of the case, the district court ordered Kelly to reimburse the defendants the sum of $611,543.30 for the reasonable attorney's fees they incurred in defending this borderline frivolous action.

The Debtor asserts that Offit Kurman breached the Credit Agreement because it withdrew its representation and did not prosecute the appeal in the Seaside HOA case to its conclusion. The Trustee, upon his investigation of the relevant facts and circumstances, believes that it would be contrary to public policy to hold that Offit Kurman was required to prosecute what was a frivolous appeal in what was a frivolous lawsuit. Indeed, such a result would force a lawyer to compromise his or her ethical obligation to advocate in good faith. *See, e.g*., Md. Rule 19-303.1 ("An attorney shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis for doing so that is not frivolous"). Further, Kelly did not oppose Offit Kurman's withdrawal in the trial court and, therefore, may have waived her right to object to the withdrawal as a breach of contract in this action. In any event, there is no evidence that Kelly incurred legal expenses in the appeal above and beyond what she would have incurred had Offit Kurman remained in the case or that she otherwise suffered any monetary losses as a result of the services rendered by Offit Kurman or by its withdrawal from the case. Even if Kelly had suffered such losses, the Trustee believes that such losses would give rise, at most, to a setoff against the amounts owed to Offit

Kurman and would not invalidate the security interest given to Offit Kurman under the Credit Agreement.

The Trustee believes that a similar rationale applies, to various extents, to Offit Kurman's handling of each of the other three matters referenced in the Credit Agreement. The Naples foreclosure case has been pending for over seven (7) years and has generated over 800 docket entries in the Circuit Court for Collier County. The Debtor and Kelly, who are co-defendants in this action, were represented by Offit Kurman through the trial of this matter, where they lost on the merits. A final judgment of foreclosure was entered on September 10, 2015. Offit Kurman, at the Debtor's request, thereafter withdrew its representation of the Debtor, but continued to represent Kelly and noticed an appeal on her behalf. The Debtor, meanwhile, noticed a separate appeal *pro se*. Offit Kurman ultimately withdrew its representation of Kelly by court order entered on January 11, 2016.

The Debtor and Kelly appear to have little chance of success on appeal in the Naples foreclosure case given the foreclosure judgment against them. The Debtor and Kelly also may have waived their right to object to Offit Kurman's withdrawal as a breach of contract in this action because they did not oppose the withdrawal in the trial court. In any event, they do not appear to have suffered any losses as a result of Offit Kurman's withdrawal. Consequently, the Trustee believes that it is highly questionable whether Offit Kurman's withdrawal from the Naples foreclosure case provides adequate grounds to invalidate the security interest given under the Credit Agreement.

With respect to the Regions Bank case and the Lot 6 foreclosure case, Offit Kurman did, in fact, litigate these matters to conclusion. The Debtor and Kelly lost the Regions Bank case at summary judgment. Offit Kurman then noticed an appeal to the Eleventh Circuit on their behalf.

10

The Regions Bank case settled during the appeal and the appeal was dismissed on April 10, 2015. The Lot 6 foreclosure case, meanwhile, was settled on April 27, 2015 prior to trial. Thus, the Trustee has concluded that the security interest given to Offit Kurman under the Credit Agreement likely cannot be invalidated based on events in the Regions Bank and Lot 6 foreclosure cases.

**3.     The alleged "dragnet clause" in the Mortgage and sale of Lot 3**.

The Debtor's assertion that $215,000.00 is the maximum security available to Offit Kurman is subject to serious question in light of all the factors considered by the Trustee. The Debtor's theory is that the sale of the Lot 3 property for $335,000.00 reduced the amount available under the mortgage from $550,000.00 to $215,000.00 and that the amount secured did not thereafter increase to $550,000.00 as the Debtor and his wife incurred additional legal fees.

The Mortgage filed in the land records of Walton County, Florida with respect to Lot 6 provides that it "is given to secure, <u>up to a maximum amount of Five Hundred Fifty Thousand and No/100 Dollars ($550,000.00)</u>…[the] payment by Borrower of the Indebtedness" and that "THE MAXIMUM AMOUNT OF PRINCIPAL TO BE SECURED HEREBY AT ANY ONE TIME IS FIVE HUNDRED FIFTY THOUSAND AND NO/100 DOLLARS ($550,000.00) (emphasis in original). The term "Indebtedness" is defined in the Mortgage to include "all principal and interest payable by Borrower under the Credit Agreement."

The Debtor asserts that these provisions in the Mortgage constitute a "dragnet" clause, which is disfavored under Florida law. The Trustee, however, does not believe that the Mortgage contains a "dragnet" clause. A "dragnet" clause generally refers to a mortgage provision that purports to pledge real estate as security for other, usually unspecified, debts that the mortgagor may already owe or may owe in the future to the mortgagee. Here the Mortgage provides security only for the indebtedness specified in the Credit Agreement and does not "drag in" other unrelated

11

debts. The Credit Agreement, meanwhile, provides that Kelly will be responsible for paying to Offit Kurman the "Total Amount Due," which is defined as the outstanding balance owed to Offit Kurman as of December 1, 2013 plus all fees and costs incurred in performing future legal services in four enumerated matters. The Credit Agreement further provides that Kelly's obligation to pay the Total Amount Due, which includes future legal services, is secured by the mortgages on Lot 3 and Lot 6.

Further, even if the Mortgage could be construed to contain a "dragnet" clause, such clauses are enforceable if the language of the clause is clear as to the parties' intent to secure future debt. Offit Kurman has asserted, and the Trustee reasonably believes, that read together, the Credit Agreement and Mortgage contemplate what is essentially a revolving line of credit of up to $550,000 to secure the payment of Offit Kurman's pre-existing legal fees as of December 1, 2013 and all future legal fees and costs incurred with respect to the four matters enumerated in the Credit Agreement. Offit Kurman reasonably argues that use of the terms "up to a maximum amount" and "at any one time" indicate that the parties contemplated that the amount of security would vary over the term of the agreement but would not exceed $550,000.00. Thus, the Trustee believes there is strong support for Offit Kurman's position, as evidenced by its Amended POC, that it has a $550,000.00 security interest in the proceeds from the sale of Lot 6.[7]

### 4. The Debtor's malpractice claim and alleged offsets against Offit Kurman

Although the Debtor asserts in the complaint that he and Kelly have suffered "damages" that they are entitled to offset against the amount owed to Offit Kurman, the Debtor did not specify

---

[7] Given the Debtor's propensity for running up enormous legal bills and then attempting to evade his responsibility to pay counsel for services rendered, and Offit Kurman's first-hand experience with this *modus operandi*, it is highly unlikely as a practical matter that Offit Kurman would have agreed to render additional legal services to the Debtor and Kelly in the absence of an agreement adequately securing payment of the firm's future legal fees.

what damages he allegedly sustained. Further, the Trustee is not aware of any damages sustained by the Debtor or Kelly from Offit Kurman's conduct despite affording the Debtor and Kelly ample opportunity for explanation. To the extent that the Debtor claims that Offit Kurman committed legal malpractice in its representation of him in the Naples foreclosure case, such a claim appears to be far-fetched (but consistent with the Debtor's penchant for blaming others for his failures).

As the Trustee understands it, the gist of the Debtor's scheduled malpractice claim arises out of a post-judgment hearing in the Naples foreclosure case concerning the amount of the *supersedeas* bond that the Debtor would be required to post in order to obtain a stay pending appeal. At this stage of the litigation, the Debtor had dismissed Offit Kurman as his personal counsel. Offit Kurman was still counsel of record for Kelly but a motion to withdraw Offit Kurman's appearance was pending

The Debtor took the position that there was sufficient equity in the Naples property to secure the appeal. In order to prove his assertion regarding the available equity in the Naples property, the Debtor obtained a report from an appraiser that Offit Kurman previously had identified. At the bond hearing, the Debtor, who appeared *pro se*, attempted to offer the appraiser's written report into evidence. The lender objected on hearsay grounds and its objection was sustained. The Debtor then read into the record as much of the report as was permitted by the court. Ultimately, the court ruled that there was insufficient equity in the Naples property to secure the appeal and denied the Debtor's request to dispense with a *supersedeas* bond.

The Debtor alleges that Offit Kurman committed malpractice because it allegedly did not advise him to have the appraiser appear at the bond hearing to testify in person. Given that there was no attorney-client relationship between the Debtor and Offit Kurman at the time of the bond hearing, it is difficult for the Trustee to understand how any malpractice claim could lie against

13

Offit Kurman in these circumstances. Moreover, notwithstanding the lack of privity, under a "case within the case" analysis, it is likewise difficult for the Trustee to conclude that the Florida court would have ruled differently had the appraiser testified in person. Thus, it is the Trustee's opinion that there is little merit in the Debtor's purported malpractice claim.

**5.     The Debtor's remaining allegations against Offit Kurman**

The Debtor contends that there is no agreement between him and Offit Kurman regarding payment of the legal fees incurred in the two matters making up Offit Kurman's unsecured joint claim. In these matters, the Silver Laurel Way foreclosure and the Wetherill Road foreclosure, Offit Kurman jointly represented the Debtor and Kelly, who were named as co-defendants in each case. While there is no written fee agreement between the parties with respect to Offit Kurman's handling of these matters, it appears to the Trustee that Offit Kurman nevertheless would have a colorable claim for compensation because they rendered legal services to the Debtor and Kelly at their request. Indeed, there is no dispute that Offit Kurman rendered services to the Debtor and Kelly and that Offit Kurman rendered services with the expectation that it would be paid for its services, as evidenced by the monthly invoices it sent to the Debtor and Kelly. Thus, it is the Trustee's informed belief that the Debtor and Kelly are unlikely to avoid responsibility for the payment of Offit Kurman's unsecured joint claim.[8]

**6.     The credibility of Myers and Kelly**

The Trustee also has assessed the credibility of the Debtor and Kelly in analyzing the merits of the proposed settlement. If this matter was to go to trial, the Debtor and Kelly likely would be

---

[8] Given that Offit Kurman intends to waive and release its unsecured individual claim against the Debtor, there is no need to analyze or debate whether the amount owed is $23,605.96 (as alleged by Offit Kurman in its Amended POC) or no more than $20,482.00 (as alleged by the Debtor in the complaint).

14

called as witnesses and, therefore, the credibility of any testimony they may give would be important to the Trustee's case.

The Trustee had the opportunity to depose the Debtor in this case and observe his demeanor. The Trustee also observed the Debtor's demeanor during his Rule 2004 examination, when he was questioned about matters pertaining to this adversary proceeding, and has watched the Debtor speak in court and outside of court on numerous occasions. Simply stated, it is the Trustee's opinion that the Debtor is not a credible witness. The Debtor frequently is evasive when responding to questions and seldom gives a candid answer. He has given conflicting testimony such as when he testified during his Rule 2004 exam that Offit Kurman did not represent him in the Silver Laurel Way foreclosure case notwithstanding that he had previously submitted an affidavit in that very case in which he acknowledged that Offit Kurman was his counsel. Additionally, the Debtor testified during his Rule 2004 exam that he takes medications which affect his memory. Indeed, the Debtor answered "I don't recall," "I don't know," or used words that effect over 90 times in his Rule 2004 examination. Thus, the Trustee believes that the Debtor offers little to no utility as a witness and would be subject to impeachment.

The Trustee also has had the opportunity to observe Barbara Kelly's demeanor in court and outside of court, and has reviewed transcripts of her testimony in other matters. Kelly been extremely unwilling to cooperate with the Trustee as evidenced by the motions to compel that the Trustee has had to file against her. Further, Kelly's decision to walk out of her deposition in this case when she learned that the Debtor would not be permitted to sit in the room during the deposition speaks volumes about Kelly's ability to testify independently. Additionally, it is apparent from transcripts of her prior testimony that she generally has a very poor recollection of events. The Trustee believes that Kelly's credibility is highly suspect and the fact that she was the

plaintiff in a frivolous, or borderline frivolous, lawsuit certainly does not help her credibility. In short, the Trustee believes that his case would not be materially aided by testimony from Kelly or the Debtor and, in fact, could be harmed if either were called as a witness.[9]

As demonstrated herein, the Trustee has undertaken a thorough and painstaking analysis of all of the relevant facts and circumstances. The Trustee has analyzed the strengths of the evidence and the merits of the legal arguments on both sides. The Trustee has evaluated his chances of success at trial as well as the possibility of adverse judgment. In consideration of the contemplated cost to litigate this matter through a contested trial and possible appeal, the concomitant risk of an adverse ruling, and the omnipresent vagaries of litigation, the Trustee, in the exercise of his judgment, believes that the above-proposed compromise and settlement is in the best interests of all parties-in-interest herein. Therefore, the Trustee strongly recommends approval of the proposed compromise and settlement.

**Manner of Objection**

Parties in interest objecting to the proposed action by the Debtor are to file such Objections in writing with the United States Bankruptcy Court, 6500 Cherrywood Lane, Suite 300, Greenbelt, Maryland 20770, by not later than twenty-one (21) days after the date of this Notice; with a copy of said Objection to be provided to the undersigned by the same date. Objections must specifically state the factual and legal grounds upon which such Objection is based. Hearings may be held before the United States Bankruptcy Court upon any such Objections as are filed, or the Court may determine the matter without a hearing. A hearing may be held before the United States

---

[9] In contrast to the Debtor and Kelly, it should be noted that Offit Kurman's representatives facilitated the Trustee's review of the foregoing records and were forthright and candid in their discussions with the Trustee's counsel regarding the matters at issue in this adversary proceeding. Additionally, Aaron Bukowitz of Offit Kurman, when deposed by the Trustee's counsel, came across as an earnest and very credible witness with nothing to hide.

Bankruptcy Court, upon any such Objections as are filed, or the Court may determine the matter without a hearing.  Further, the Court may conduct the hearing in its discretion regardless of whether any Objections are filed.  Any party in interest filing an Objection may be required to be present at such hearing as may be held.  If no Objection is filed within the period above-provided, the Court will proceed to consider the Debtor's proposed compromise and settlement as above-proposed without further notice to parties in interest.  Parties in interest desiring further information should consult the Court file, or may communicate with the undersigned.

Date:  <u>September 20, 2017</u>                    Respectfully submitted,

                                                  SCHLOSSBERG, MASTRO & SCANLAN

                                                  By:  <u>*/s/ Frank J. Mastro*</u>
                                                        Frank J. Mastro #24679
                                                        Roger Schlossberg
                                                        18421 Henson Blvd., Suite 201
                                                        Hagerstown, MD 21742
                                                        (301) 739-8610
                                                        *Attorneys for Trustee*

# OFFIT KURMAN SETTLEMENT
# TERM SHEET

September 12, 2017

| | |
|---|---|
| *Parties* | Roger Schlossberg, Trustee for the bankruptcy estate of Gregory B. Myers ("Trustee") <br><br> Offit Kurman, P.A. ("OK") |
| *Recitals* | November 18, 2015 (the "Petition Date") Gregory B. Myers (the "Debtor") commenced case under Chapter 11 <br><br> February 22, 2017 case was converted to Chapter 7 and Trustee appointed <br><br> OK filed a POC #14-2 asserting that it is owed $758,722.23 with $550,000 secured by Lot 6 and an unsecured claim of $208,722.23. The unsecured portion includes a $23,605.96 unsecured claim against GM and $185,116.27 joint unsecured claim against GM and BAK. OK also has a separate $145,849.01 unsecured claim against BAK that is not part of the Debtor's bankruptcy case. <br><br> Trustee sold Lot 6 (joint asset) for $1.1 million and funds are being held in escrow pending distribution (the "Escrow"). <br><br> Prior to conversion, Debtor filed adversary complaint against OK to determine priority and extent of lien and objection to POC <br><br> OK has certain defenses to adversary proceeding and has denied liability <br><br> Parties desire to resolve adversary proceeding without any admission of liability <br><br> Trustee's exercise of business judgment to settle adversary proceeding |
| *Settlement* | OK will have an allowed joint secured claim for $550,000 and an allowed joint unsecured claim for $185,116.27 <br><br> OK will waive/release its unsecured claim that is solely against the Debtor in the amount of $23,605.96 <br><br> OK will consent to $25,000.00 of its allowed joint secured claim and all of its $185,116.27 allowed joint unsecured claim to be surcharged |

|  | | |
|---|---|---|
|  | | (the "Surcharge") by the Trustee to pay for any allowed fees and expenses approved by the Court for the administration of the estate and, if there are sufficient amounts available in the Surcharge, then for a distribution to allowed general unsecured creditors. The Surcharge will be paid to the Trustee upon Bankruptcy Court approval<br><br>OK will receive a distribution of the remaining $525,000.00 of its joint secured claim in immediately available cash from the Escrow upon Bankruptcy Court approval<br><br>OK will retain its rights to collect the $145,849.01 unsecured claim against BAK and OK does not release any claims pursuant to the Credit Agreement. |
| *Approval* | | Settlement is subject to Bankruptcy Court approval |
| *Dismissal* | | Upon Bankruptcy Court approval and the payment of $210,116.27 to the Trustee and $525,000.00 to OK, the Trustee shall dismiss the adversary proceeding with prejudice and release shall be effective |
| *Release* | | OK shall release and discharge Trustee, e and its counsel from any and all claims, known or unknown, as well as release and discharge Debtor as to the Credit Agreement, and the unsecured claim that is solely against the Debtor.<br><br>Trustee shall release OK from any and all claims, known or unknown, that have been or could have been asserted by Greg Myers including, but not limited to, any and all claims sounding in contract and negligence.<br><br>Other than the credit to be given against the joint debts owed herein, nothing established herein shall release any claims OK may have against BAK—any and all such claims are expressly retained by OK. |
| *Compromise* | | Agreement is a compromise and settlement of a disputed claim and in no way constitutes an admission of any fault or any liability |
| *Attorneys' Fees and Costs* | | Parties shall bear their own attorneys' fees and costs |
| *Standard Settlement Terms* | | Breach, Representations and Warranties, Authority, Arms' Length Agreement, Construction & Jurisdiction, Entire Agreement, Notice, and Court approval, etc. |